**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

_____

)

DAVID M. ROEDER, _et al._,                )

)

        Plaintiffs,                )

)  Civ. Action No. 08-487 (EGS)

      v.                )

)

THE ISLAMIC REPUBLIC OF IRAN,                )

)

        Defendant.                )

_____)

## <u>MEMORANDUM OPINION</u>

This case represents the latest in a series of attempts by plaintiffs, who were taken hostage by the government of the Islamic Republic of Iran in 1979, to hold that country responsible for their tremendous suffering.  Plaintiffs have attempted to sue Iran at various times since 1983, without success.  _See_, _e.g._, _Persinger v. Islamic Republic of Iran_, 729 F.2d 835 (D.C. Cir. 1984); _McKeel v. Islamic Republic of Iran_, 722 F.2d 582 (9th Cir. 1983); _Ledgerwood v. State of Iran_, 617 F. Supp. 311 (D.D.C. 1985).  Plaintiffs again filed suit in this Court in 2000, in _Roeder v. Islamic Republic of Iran_, Civ. Action No. 00-3110(EGS) (hereinafter "_Roeder I_").  In April 2002, this Court dismissed plaintiffs' claims.  _See Roeder I_, 195 F. Supp. 2d 140 (D.D.C. 2002).  This Court held that the Foreign Sovereign Immunities Act ("FSIA"), as it existed in

2002, did not create a private right of action against the government of Iran and accordingly that plaintiffs could not pursue their claims against Iran. The Court of Appeals affirmed the decision in 2003. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003) (also referenced herein as *Roeder I*).

In their previous cases, including *Roeder I*, plaintiffs have been thwarted by the Algiers Accords, the 1981 executive, bi-lateral agreement between the United States and Iran that secured the hostages' release. Both the Algiers Accords and its implementing regulations contain express prohibitions barring lawsuits arising out of the hostage taking. As this Court and the Court of Appeals explained in *Roeder I*, Congress has the authority to abrogate the Algiers Accords; however, it must act clearly and unambiguously to do so. *See Roeder I*, 195 F. Supp. 2d at 168-170, *aff'd* 333 F.3d 237-238. In *Roeder I*, this Circuit concluded that as of 2002 Congress had not acted clearly or unambiguously, and thus dismissed plaintiffs' claims. *See* 195 F. Supp.2d at 166; *aff'd* 333 F.3d at 238.

Now, several years later, plaintiffs have returned to this Court and filed the instant case (hereinafter "*Roeder II*"). Plaintiffs argue that in the years since *Roeder I* was decided, Congress has created a private right of action which enables them to proceed with a lawsuit against Iran. Specifically, they

argue that by enacting the National Defense Authorization Act for Fiscal Year 2008, Congress has finally spoken clearly and unambiguously, and created a cause of action to enable them to sue Iran for damages. Compl. ¶ 20. The United States intervened and shortly thereafter filed a motion to dismiss, arguing that once again, Congress has failed to act with sufficient clarity to abrogate the Algiers Accords. This Court is thus confronted with the same fundamental question it faced in 2002: whether Congress has acted definitively to abrogate the Algiers Accords and enable plaintiffs to move forward in their suit for damages. With an equal measure of frustration, regret, and compassion the Court must conclude, once again, that Congress has failed to provide plaintiffs with a cause of action against Iran. Accordingly, this Court is not empowered to provide plaintiffs the relief they seek and the United States' motion to dismiss must be **GRANTED**.

I.    **BACKGROUND**

A.    *Roeder I*, **and the State of the Law When it Was Decided**

As set forth above, this Court does not write on a clean slate: this case, like *Roeder I*, rests squarely on whether Congress has abrogated the Algiers Accords. As explained in *Roeder I*, the Algiers Accords is an international executive agreement the United States entered into with the Islamic Republic of Iran on January 19, 1981, in order to obtain the

3

freedom of the plaintiff hostages.  Among other commitments
contained in the agreement, the United States agreed to "bar and
preclude the prosecution against Iran of any pending or future
claim of . . . a United States national arising out of the
events . . . related to (A) the seizure of the 52 United States
nationals on November 4, 1979, [and] (B) their subsequent
detention."  Declaration of the Government of the Democratic and
Popular Republic of Algeria, ¶ 11 (reprinted at 20 I.L.M. 223,
227).

     The *Roeder I* courts explained that a statute must satisfy
one of two criteria to overturn a previously-enacted
international agreement such as the Algiers Accords.  First, if
a later statute unambiguously conflicts with the international
agreement on its face, the unambiguous later statute will
prevail.  *See Roeder I*, 195 F. Supp. 2d at 170 (citing *Reid v.
Covert*, 354 U.S. 1, 17 (1957); *Whitney v. Robertson*, 124 U.S.
190, 191 (1888); *Committee of United States Citizens Living in
Nicaragua v. Reagan*, 859 F.2d 929, 936-37 (D.C. Cir. 1988);
*South African Airways v. Dole*, 817 F.2d 119, 126 (D.C. Cir.
1987)).  If the statute is ambiguous, however, a Court will not
interpret it to modify or abrogate a treaty or executive
agreement "unless such purpose of Congress has been clearly
expressed."  *Bennett v. Islamic Republic of Iran*, No. 09-5147,
2010 WL 3515811 at *4 (D.C. Cir. Sept. 10, 2010) (quotation

omitted, citing *Roeder I*, 333 F.3d at 237).  As the Court of Appeals explained:

> Executive agreements are essentially contracts between
> nations, and like contracts between individuals,
> executive agreements are expected to be honored by the
> parties.  Congress (or the President acting alone) may
> abrogate an executive agreement, but legislation must
> be clear to ensure that Congress – and the President –
> have considered the consequences.  The requirement of
> clear statement assures that the legislature has in
> fact faced, and intended to bring into issue, the
> critical matters involved in the judicial decision.

*Roeder I*, 333 F.3d at 238 (internal citation omitted).

Accordingly, in *Roeder I*, the courts determined that an Act of Congress will only abrogate the Algiers Accords' bar to the hostages' ability to sue if it (1) clearly and unambiguously gives the Court subject matter jurisdiction to hear plaintiffs' case, and (2) clearly and unambiguously creates a cause of action against Iran for the 1979 hostage taking. *See Roeder I*, 195 F. Supp. 2d at 163, 167, *aff'd* 333 F.3d at 236-237.  This Court found, and the D.C. Circuit affirmed, that when *Roeder I* was decided, Congress had provided the first, but not the second.  The *Roeder I* courts' analysis of subject matter jurisdiction and private rights of action are briefly summarized in turn.

As a general matter, the FSIA grants foreign states immunity from liability in United States courts.  Federal courts thus generally lack subject matter jurisdiction over claims

against a foreign state. Congress has, however, provided several specific exceptions to this immunity. *See* 28 U.S.C. § 1604; *see also Roeder I*, 333 F.3d at 235. The Anti-Terrorism Act of 1996 created one such exception, and allowed jurisdiction over foreign states for certain state-sponsored acts of terrorism. *See* 28 U.S.C. § 1605(a)(7) (1996). Initially, the 1979 hostage-taking of the *Roeder I* plaintiffs did not fall within that exception; however, Congress amended the law in 2001 to specifically waive sovereign immunity for acts "related to Case Number 1:00CV03110(EGS)[1] in the United States District Court for the District of Columbia." Pub. L. 107-77, 115 Stat. 748 (2001) ("Section 626(c)"). Thus, Section 626(c) amended the FSIA to remove sovereign immunity and create jurisdiction for any acts that related to *Roeder I*. *See* 195 F. Supp. 2d at 163; *aff'd* 333 F.3d at 235. The *Roeder I* courts found that Congress had therefore clearly and unambiguously created subject matter jurisdiction for plaintiffs' claims to be heard in this Court.

The *Roeder I* courts next turned to the question of whether the 2001 amendments to the FSIA unambiguously created a cause of action for plaintiffs to sue Iran. The courts found that

---

[1] The text originally read ". . . (ESG) . . ." but was corrected in January 2002 to properly set forth the undersigned's initials. *See* Pub. L. 107-117, 115 Stat. 2230 (2002).

Congress had not unambiguously created such a cause of action.
As this Court explained, while the exceptions to sovereign
immunity "allowed federal courts to have jurisdiction over
claims against foreign governments arising [out] of state
sponsored terrorist activity. . . . [w]hat the [exceptions] did
not do was create a private cause of action for the victims of
state-sponsored terrorism.  Like all the other exceptions to
foreign sovereign immunity in the FSIA, victims of state-
sponsored terrorism had to look to other laws to provide a cause
of action against the foreign state." *Roeder I*, 195 F. Supp.
2d. at 171 (citations omitted).  When *Roeder I* was decided, the
sole unambiguous private cause of action for victims of
terrorism under federal law was conferred by the Flatow
Amendment of 1996, 28 U.S.C. § 1605 note, which only provided "a
private right of action against officials, employees and agents
of a foreign state, not against the foreign state itself."
*Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033
(D.C. Cir. 2004)(superseded by statute); *see also In re: Islamic
Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 46
(D.D.C. 2009).  The 2001 amendments to the FSIA did not clearly
expand this cause of action.

As such, the courts found that the 2001 amendments to the
FSIA were ambiguous.  While it was possible to interpret the
amendments as creating a new private right of action for

plaintiffs, it was equally plausible to read the amendments to confer subject matter jurisdiction over the lawsuit but not to create a cause of action for plaintiffs to sue the state of Iran. *See* 195 F. Supp. 2d at 171; *aff'd* 333 F.3d at 236. Because the Courts found the statutory text ambiguous, they examined the statute and the legislative history to determine whether Congress expressed a clear *intent* to abrogate the Algiers Accords. *See id*. Neither this Court nor the D.C. Circuit found a sufficiently clear manifestation of congressional intent. Accordingly, because Congress had neither created an unambiguous cause of action nor demonstrated a clear intent to abrogate the Algiers Accords, plaintiffs were barred from pursuing their claims against the Islamic Republic of Iran in *Roeder I*.

**B. Congressional Efforts After *Roeder I*, and the Existing State of the Law.**

Following *Roeder I*, several bills were introduced in Congress which, if enacted, would have undoubtedly provided the 1979 hostages with a viable means to sue Iran. In a 2008 Report for Congress, the Congressional Research Service details attempts in the 107th, 108th, 109th, and 110th sessions of Congress "to enact legislation that would explicitly abrogate the provision of the Algiers Accords barring the hostages' suit." JENNIFER K. ELSEA, CONGRESSIONAL RESEARCH SERV., SUITS AGAINST

TERRORIST STATES BY VICTIMS OF TERRORISM (2008), p. CRS-31, *available at* http://www.fas.org/sgp/crs/terror/RL31258.pdf. As set forth more fully in the Report, Congress has considered multiple bills containing language expressly nullifying the relevant provisions of the Algiers Accords. *Id.* at CRS-31, -32. None of that language, however, was enacted into law. *Id.*

Rather, in January of 2008, Congress enacted and the President signed into law the National Defense Authorization Act of 2008 ("NDAA"), Pub. L. 110-181, 122 Stat. 3 (2008), which precipitated the filing of the instant lawsuit. For the purposes of resolving the issues in this case, the only relevant provision is Section 1083, which has been codified at 28 U.S.C. § 1605A. The Court will provide a brief overview of the three relevant provisions of § 1083 here; detailed analysis of each provision will be set forth *infra*.

### i. 28 U.S.C. § 1605A(a)

Title 28 U.S.C. § 1605A(a) reformulates the terrorism exceptions to sovereign immunity. It incorporates one new provision that encompasses both: (1) the terrorism exception to the jurisdictional immunity of a foreign state, which originally appeared in the Anti-Terrorism Act of 1996, and (2) the specific exception to sovereign immunity for *Roeder I* that was set forth in § 626(c).

### ii.  28 U.S.C. §§ 1605A(c) and 1605A Note

Title 28 U.S.C. § 1605A(c) is titled "Private Right of
Action."  It creates a cause of action for damages against a
"foreign state that is or was a state sponsor of terrorism"
under certain circumstances which are set forth elsewhere in the
statute.  *See* 28 U.S.C. § 1605A(c).  Only one such circumstance
is relevant for the purposes of this case. This circumstance is
set forth at Section 1083(c) of the NDAA, codified as 28 U.S.C.
§ 1605A note, and provides that certain cases that are otherwise
time-barred may be filed or refiled under the new statute.

Section 1083(c) delineates the scope of retroactive relief
available under § 1605A.  It sets forth two situations where the
NDAA may apply to cases filed prior to its enactment.  First,
section 1083(c)(2), titled "Prior Actions," provides that
certain cases which were still pending before the courts under
the preceding statutory scheme when the NDAA was enacted may be
refiled under the NDAA.  By refiling, claimants may take
advantage of the new statute's provisions, which are
significantly more favorable to terrorism plaintiffs in general.
Second, section 1083(c)(3), titled "Related Actions," provides
that certain new actions may be filed under the NDAA if they
arose out of the same act or incident as cases filed under the
previous statutory scheme.  It reads, in relevant part,

(3) RELATED ACTIONS. - If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code . . . any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after —

(A) the date of the entry of judgment in the original action; or

(B) the date of the enactment of this Act [Jan. 28, 2008].

Taken together, § 1605A(c) and § 1083(c)(3) provide a cause of action against state sponsors of terrorism in otherwise-untimely *new actions* under the NDAA - not refiled old ones - so long as the new action is "related" to another action that has been timely commenced under the FSIA and Anti-Terrorism Act of 1996.

## II. PROCEDURAL HISTORY

On March 21, 2008, plaintiffs commenced this action against the Islamic Republic of Iran alleging violations of 28 U.S.C. § 1605A. They assert that *Roeder II* is "related" to *Roeder I*, as defined in Section 1083(c)(3) of the NDAA (28 U.S.C. § 1605A note) and therefore that they have a cause of action under § 1605A(c). Compl. p. 2, *see also* ¶¶ 21-24. Specifically, they allege that "[t]his action is a related action to *Roeder v. Islamic Republic of Iran, et al.*, Case No. 1:00CV03110(EGS), and arises out of the same act or incident which was timely commenced under section 1605(a)(7) of title 28 in this Court.

As such, this action qualifies as a related action under 28 U.S.C. § 1605A." Compl. p. 2. They seek 6.6 billion dollars in compensatory and punitive damages.

In light of the events of *Roeder I*, namely Iran's refusal to appear in this Court and the United States' last minute intervention in the litigation, the Court extended an invitation to the Department of State to "file a statement of interest in the present case, if appropriate, pursuant to 28 U.S.C. § 517." Doc. No. 7, Letter from Hon. Emmet G. Sullivan to John B. Bellinger III, Legal Advisor, U.S. Department of State, April 11, 2008. The government responded in June 2008, stating that if plaintiffs were able to perfect service on Iran and the case were to go forward, "the United States may well have an interest in participating in this litigation." Doc. No. 11, Report of United States, June 13, 2008.

Plaintiffs served Iran at the end of November 2008, but Iran elected not to appear. In April 2009, plaintiffs filed a motion for default judgment as to liability. Immediately thereafter, the United States moved to intervene in this lawsuit and subsequently filed a motion to dismiss. In early October 2009, plaintiffs filed a notice of supplemental authority: *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31 (D.D.C. 2009). Following briefing on this supplemental authority, this Court heard oral argument on the government's

motion to dismiss on April 21, 2010.  At the hearing, the Court expressed its concern about the lack of clarity in § 1083.  The Court continued the motions hearing for 30 days and directed the parties to inform the Court in the event of any further Congressional developments.  The Court reconvened the hearing on May 27, 2010, confirmed with the parties that no Congressional action had been taken, and took the case under advisement.  The parties' motions are now ripe for resolution by the Court.

## III. ANALYSIS

Pending before the Court is the United States' motion to dismiss for failure to state a claim.  In its motion to dismiss, the government concedes that § 1083 of the NDAA provides a cause of action against Iran under certain circumstances, but argues that those circumstances do not unambiguously include plaintiffs' case.  Thus, the government argues, Congress has not clearly abrogated the Algiers Accords' substantive bar to this litigation.  The United States argues that while § 1083 creates substantive rights for other victims of terrorism, it did not cure the 1979 hostages' inability to pursue claims against Iran. Plaintiffs raise three main arguments in opposition.  First, they argue that Congress unambiguously created a private right of action for plaintiffs, in particular, to sue Iran pursuant to § 1605A(a)(2)(b).  Alternatively, plaintiffs argue that

§ 1605A(c) and NDAA section 1083(c), taken together, unambiguously create a cause of action because *Roeder I* qualifies as a "related action" to *Roeder II* as that term is defined by § 1083(c)(3).  Finally, plaintiffs argue that "[e]ven if Congress [] enacted ambiguous statutory language . . . § 1083 would still abrogate the Algiers Accords because Congress's intent to do so is overwhelmingly clear."  Pls.' Opp'n at 6.

After careful consideration of the parties' arguments and the applicable law, the Court finds that plaintiffs' ability to sue the government of Iran has not changed since *Roeder I*: § 1083 does not unambiguously create a cause of action for these plaintiffs against Iran.  The Court's holding in *Roeder I* applies equally to the new statutory scheme:  "Because th[e] statute is ambiguous, and because [§ 1083] [n]ever mentions the Algiers Accords in statutory text or legislative history, this Court cannot interpret this legislation to implicitly abrogate a binding international agreement.  Therefore this Court must dismiss plaintiffs' claims."  195 F. Supp. 2d at 166.

## A.   Congress Must Act Clearly and Unambiguously to Overturn the Algiers Accords.

The parties agree that this case, like *Roeder I*, turns on whether a later-in-time statute abrogates the Algiers Accords. On September 10, 2010, the D.C. Circuit reaffirmed the demanding standard a party must meet in order to show that a treaty or

executive agreement has been abrogated or substantively modified by a later statute. *See Bennett v. Islamic Republic of Iran*, 2010 WL 3515811 at *4 (citing *Roeder I*, 333 F.3d at 237). As fully set forth in the *Roeder I* decisions, and recapitulated in Section I.A *supra*, it is not enough to show that a later-in-time statute may be read to abrogate a previously-enacted international agreement. Rather, the later statute must *unambiguously* conflict with the agreement in its language and effect. A statute is only unambiguous if it is not "reasonably susceptible to more than one meaning." *McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999); *see also U.S. v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (statute is ambiguous when more than one interpretation is possible); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 4 (D.C. Cir. 1999) (finding statute ambiguous because, "[a]lthough the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable."). If the later statute is not unambiguous on its face, it must contain a *clear expression of Congressional intent* to abrogate the earlier agreement. *See Roeder I*, 195 F. Supp. 2d at 169-170 (collecting cases); *see also* 333 F.3d at 237-38 (collecting cases). As set forth by this Court in *Roeder I*:

> The Supreme Court has provided some guidance as to
> what it will accept and not accept as a clear
> expression of legislative intent in this context. The

Supreme Court has unequivocally held that legislative silence is not sufficient to abrogate a treaty or a bi-lateral executive international agreement. When a later statute conflicts with an earlier agreement, and Congress has neither mentioned the agreement in the text of the statute nor in the legislative history of the statute, the Supreme Court has conclusively held that it can not find the requisite Congressional intent to abrogate.

*Roeder I*, 195 F. Supp. 2d at 175 (internal citations and quotations omitted); *aff'd* 333 F.3d at 238. The law on this issue has not changed since *Roeder I* was decided. *See, e.g., Medellin v. Texas*, 552 U.S. 491, 509 n.5 (2008).[2]

In short, when interpreting newly created federal legislation which covers the same legal ground as pre-existing international agreements, this Court's role is extremely limited. As set forth in *Roeder I*,

There are two branches of government that are empowered to abrogate and rescind the Algiers Accords, and the judiciary is not one of them. The political

---

[2] The *Medellin* Court cited *Cook v. United States*, 288 U.S. 102, 119-120 (1933), for the proposition that a later-in-time federal statute supersedes inconsistent treaty provisions. *Cook*, in turn, recited the already-settled principle that "a treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed. Here, the contrary appears. The committee reports and the debates upon the act of 1930, like the re-enacted section itself, make no reference to the Treaty." *Id.* (citations omitted). Accordingly, the *Cook* court found that the treaty at issue in that case remained unaffected by the later-in-time statute. *Id.*

considerations that must be balanced prior to such a
decision are beyond both the expertise and the mandate
of this Court.  Unless and until either the
legislative or executive branch acts clearly and
decisively, this Court cannot grant plaintiffs the
relief they seek.

195 F. Supp. 2d at 145.

## B. Section 1605A(a) Does Not Unambiguously Create A Cause of Action for Plaintiffs.

In their opposition to the motion to dismiss, plaintiffs
argue that § 1605A(a)(2)(B) unambiguously creates a cause of
action specifically for them.  Pls.' Opp'n 6-19.  The government
counters that § 1605A(a)(2)(B) only confers subject matter
jurisdiction on the courts; it does not create a cause of action
for plaintiffs to sue Iran.  After careful consideration, and as
explained more fully below, the Court finds that the text and
structure of the statute do not support plaintiffs'
construction.  Moreover, plaintiffs' construction of
§ 1605A(a)(2)(B) ignores the binding authority of *Roeder I*, in
which the D.C. Circuit held that substantially identical
language in a predecessor statute did not unambiguously create a
cause of action.  Accordingly, the Court concludes that
§ 1605A(a)(2)(B) does not provide plaintiffs with a cause of
action against Iran.

Section 1605A(a) provides in relevant part:

(a)    IN GENERAL

    (1)    NO IMMUNITY.  A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking . . .

    (2)    CLAIM HEARD.  The court shall hear a claim under this section if –

    (A)(i)(I)  the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred . . . ; or

    [...]

    (B)    the act described in paragraph (1) is related to case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

28 U.S.C. § 1605A(a).

In order for statutory construction to withstand scrutiny, "at a minimum, [it] must account for a statute's full text, langauge as well as punctuation, structure and subject matter." *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.*, 508 U.S. 439, 455 (1993).  Plaintiffs' proposed reading of the statute violates this irreducible minimum.  The text of § 1605A(a) refers *only* to subject matter jurisdiction; it is separate and apart from § 1605A(c), which creates a cause of

action.[3]  Because § 1605A(c), not § 1605A(a), creates a cause of

action, and because the reference to *Roeder I* occurs only in the

jurisdictional section, § 1605A(a), the Court concludes that

§ 1605A(a) does not create a cause of action for plaintiffs to

sue Iran.

Plaintiffs' argument is further undermined when considered

in light of the history of this case in particular, where the

outcome of *Roeder I* hinged on the distinction between subject

matter jurisdiction and private rights of action.  As discussed

in Section I *supra*, § 1605A(a)(2)(B) is nearly identical to the

language of former § 626(c), which was central to the Court's

analysis in *Roeder I*.  This Court found that while § 626(c) did

create subject matter jurisdiction for the Court to hear

plaintiffs' claims, it did not abrogate the Algiers Accords

because it did not create a cause of action for plaintiffs

_____

[3] Section § 1605A(c) is aptly entitled "Private Right of Action."
*See* 28 U.S.C. § 1605A(c).  Unlike the jurisdictional portion of
the statute, § 1605A(c) contains no reference to *Roeder I,* nor
does it refer to or incorporate the jurisdictional subsection
where *Roeder I* is mentioned.  *Id*.  Rather, § 1605A(c)
specifically creates a cause of action with respect to a foreign
state "that is or was a state sponsor of terrorism as described
in [] § [1605A](a)(2)(A)(i)."  *Id*.  It is noteworthy that
Congress chose to explicitly incorporate another jurisdictional
provision of the statute – § 1605A(a)(2)(A)(i) - into the
section governing private rights of action, but omitted
§ (a)(2)(B), the jurisdictional provision which references
*Roeder I*.  Clearly, had Congress intended to include § (a)(2)(B)
in the section governing private rights of action, it could have
done so.

against Iran. *See Roeder I*, 195 F. Supp. 2d at 172. The D.C. Circuit explicitly affirmed this point, holding that § 626(c) spoke "only to the antecedent question of Iran's immunity from suit in United States courts." 333 F.3d at 236.

Despite this Circuit's explicit holdings that § 626(c) was *not* sufficient to create a private right of action for the hostages to sue Iran, Congress chose to cut and paste the same, insufficient language from § 626(c) in the NDAA, and to place it in the jurisdictional section of the legislation only, *not* the section entitled "Private Right of Action." As plaintiffs themselves point out, courts normally assume that "when Congress enacts statutes, it is aware of relevant judicial precedent." Pls.' Notice of Supp. Auth. at 1, (quoting *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1795 (2010); *see also,* Pls.' Opp'n at 1, 6, 7, n.6, 9 (citing, e.g., *Boumediene v. Bush*, 553 U.S. 723, 738 (2008)). Given the history and precedent regarding the crucial distinction between creation of subject matter jurisdiction and creation of a cause of action as regards *these very plaintiffs*, "the reasons for making this assumption are particularly strong here." *Merck*, 130 S. Ct. at 1795-96.

Plaintiffs make several additional arguments in support of their claim that § 1605A(a)(2)(B) unambiguously creates a cause of action against Iran. For the reasons discussed below, their arguments are unpersuasive.

First, plaintiffs assert broadly that "Congress's action in enacting § 1083 of the NDAA is entirely inexplicable other than as intended to permit plaintiffs to sue Iran and thereby to abrogate any bar to the claim under the Algiers Accords." Pls.' Opp'n at 4, *see also* 10. This argument is plainly without merit. As the government correctly notes, § 1083 is a statute of general applicability intended to permit U.S. nationals to sue many state sponsors of terrorism in U.S. courts, and is directly relevant to various cases that were pending against Iran, Cuba, and Libya, among other nations, when it was passed. Gov't Reply at 6. As noted by the D.C. Circuit and by another judge on this Court, § 1083 "is more comprehensive and more favorable to [terrorism plaintiffs generally] because it adds a broad array of substantive rights and remedies that simply were not available in actions under § 1605(a)(7)." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 58; *see also Simon et al. v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008), *rev'd on other grounds*, 129 S.Ct. 2183 (2009) (explaining NDAA's advantages to terrorism plaintiffs generally, including limiting foreign states' appeal rights, permitting plaintiffs to attach property in advance of judgment, and providing for punitive damages). Plaintiffs' argument that § 1083 is inexplicable and pointless because it does not enable

them to sue Iran for the 1979 hostage taking is simply not persuasive.

Second, plaintiffs argue that § 1605A's "identification of plaintiffs would be utterly without purpose" because a conferral of subject matter jurisdiction without creation of a private right of action would be meaningless, effectively leaving plaintiffs in the same position they were after the enactment of § 626(c). Pls.' Opp'n at 2. However, plaintiffs fail to acknowledge that the D.C. Circuit considered and rejected the identical argument in *Roeder I*. There, the Circuit held that § 626(c)'s conferral of subject matter jurisdiction was not "a futile thing" because it gave plaintiffs the opportunity to argue issues of substantive law, even if they did not ultimately prevail on those issues. 333 F.3d at 238. The same holds true here. Section 1083 of the NDAA repeals §§ 1605(a)(7) and 626(c) and replaces them with a new statute – § 1605A. *See, e.g., In re: Iran Terrorism Litig.*, 659 F. Supp. 2d at 58. In choosing to include the repealed language of § 626(c) in the new statute, Congress affirmed its intent to remove Iran's sovereign immunity with respect to plaintiffs, and to permit the courts to continue to grapple with these issues on their merits. This does not mean, however, that Congress created a private right of action for the plaintiffs.

In a related argument, plaintiffs maintain that
§ 1605A(a)(2)(B) was a direct response to *Roeder I*, and, citing
*Boumediene v. Bush*, they admonish this Court to respect the
"ongoing dialogue between and among the branches of Government."
Pls.' Opp'n at 6, 9 (quoting *Boumediene*, 553 U.S. at 738).
Plaintiffs offer no support for this argument.  Moreover, they
fail to acknowledge the fact that (i) five years passed between
*Roeder I* and the NDAA; and (ii) during those five years
legislators tried – and failed – to pass legislation that would
have responded to *Roeder I* by expressly abrogating the Algiers
Accords.  *See* Section I.B *supra*.  Moreover, even if the NDAA was
intended as a direct response to *Roeder I*, it does not mean that
it would be an effective one:  Congress directly responded to
*Roeder I* by passing section 626(c) *while the litigation was*
*ongoing*, and both this Court and the D.C. Circuit found that
response was insufficient to abrogate the Algiers Accords and
change the outcome of the litigation.

Turning to the text of the statute, plaintiffs argue that
the opening phrase of § 1605A(a)(2) "[t]he Court shall hear a
claim under this section if --" means that Congress
unambiguously created a cause of action for plaintiffs.  Pls.'
Opp'n 7-12. However, plaintiffs do not address the arguments set
forth above that the text and structure of the statute as a
whole clearly separate jurisdictional prerequisites from the

23

elements of a private right of action.  *See, e.g.*, *U.S. Nat'l Bank of Oregon*, 508 U.S. at 455; *King v. St. Vincent's Hosp.* 502 U.S. 215, 221 (1991) (enunciating the "cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context.  Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used. . . .") (internal citations and quotations omitted).  Plaintiffs rely on a number of attorneys' fees cases for the proposition that the phrase "under this section" unambiguously creates a cause of action.  Pls.' Opp'n at 7-8 (citing *Ardestani v. INS*, 502 U.S. 129, 134 (1991); *Blackman v. Dist. of Columbia*, 456 F.3d 167, 176-77 (D.C. Cir. 2006); *St. Louis Fuel and Supply Co., Inc. v. F.E.R.C.*, 890 F.2d 446 (D.C. Cir. 1989)).  These cases are inapposite.  The existence of a cause of action was not questioned in any of the cases plaintiffs cite; the parties had litigated the merits of the underlying cause of action, and the only question was whether fees should be awarded "under" the underlying statutes.  *Id.*  Even if these cases could be interpreted to argue that the ubiquitous phrase "under this section" connotes a substantive cause of action in some circumstances, they in no way support plaintiffs' claim that the language *unambiguously* requires such a

conclusion.

For the foregoing reasons, the Court finds that
§ 1605A(a)(2)(B) does not unambiguously create a cause of action
for plaintiffs to sue Iran, nor does it contain clear
Congressional intent to abrogate the Algiers Accords.

**C.    Sections 1605A(c) and 1083(c)(3) Together do not
       Unambiguously Create a Cause of Action for Plaintiffs.**

The second question at issue is whether § 1605A(c), which
undoubtedly creates a cause of action for certain victims of
terrorism, includes plaintiffs in its purview.  After careful
consideration, the Court finds that the dispositive legal issue
presented is precisely the same as in *Roeder I*.  Once again,
"[t]his Court is faced with an arguably ambiguous statutory
scheme, one interpretation of which provides a cause of action
[for plaintiffs] against Iran and conflicts with the Algiers
Accords.  This Court may therefore allow plaintiffs to proceed .
. . only if Congress has adequately expressed the requisite
clear intent to abrogate the Algiers Accords."  195 F. Supp. 2d
at 171.  And once again, this Court finds that the text of the
statutory provisions do not "contain the type of express
statutory mandate sufficient to abrogate an international
executive agreement," nor does the legislative history contain
"clear statements of Congressional intent to specifically
abrogate the Algiers Accords."  *Id.* at 177.  Accordingly, this

Court is unable to find that the executive or the legislative branch has acted clearly and decisively to enable the Court to grant plaintiffs the relief they seek.

Section 1605A(c) creates a new cause of action in certain instances as follows:

> (c) PRIVATE RIGHT OF ACTION: A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i) [of section 1605A] . . . shall be liable to . . . a national of the United States . . . for personal injury or death caused by acts described in subsection (a)(1) [of section 1605A] of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages.

Subsection (a)(2)(A)(i) contains two subsections; only one, (a)(2)(A)(i)(II) applies to this litigation. Subsection (a)(2)(A)(i)(II) defines a foreign state as a state sponsor of terrorism if:

> (II) [I]n the case of an action that is refiled under this section [1605A] by reason of section 1083(c)(2)(A) of the National Defense Appropriations Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3), the foreign state was designated as a state sponsor of terrorism when the original action or the *related action* under section 1605(a)(7) (as in effect before the enactment of this section) . . . was filed . . .

(emphasis added). The parties agree that *Roeder II* was not filed "by reason of 1083(c)(2)(A)"; therefore only § 1083(c)(3) applies in this case. Section 1083(c)(3) reads:

(c) APPLICATION TO PENDING CASES.

[. . .]

(3) RELATED ACTIONS.--If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code . . . any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after—

(A) the date of the entry of judgment in the original action; or

(B) the date of the enactment of this Act [Jan. 28, 2008].

Accordingly, plaintiffs possess a private right of action under § 1605A(c) if and only if *Roeder I* qualifies as a "related action" under § 1083(c)(3).

Plaintiffs argue that *Roeder I* unambiguously qualifies as a related action under § 1083(c)(3). The government counters that it is at least equally plausible to interpret the statute's "related action" provision to require that *Roeder I* have been pending when the NDAA was enacted. Because *Roeder I* was not pending, the government argues, plaintiffs cannot meet their burden to show § 1083(c)(3) unambiguously provides them with a cause of action against Iran. Gov't Mem. 14. The Court agrees with the government that the statute is ambiguous as to what constitutes a "related action" under § 1083(c)(3), and for the

reasons that follow, holds that Congress did not create an unambiguous cause of action for these plaintiffs.

### i.   The Government's Claims

Beginning with the proposition that "the statute is anything but a model of clarity," the government argues that the structure and text of § 1083(c) suggest that *Roeder I* cannot be considered a "related action" under § 1083(c)(3).  Gov't Mem. 14.  The government first considers the heading of § 1083(c): "Application to Pending Cases."  Section 1083(c)(3) is a subset of the "Pending Cases" section; thus, to be considered a "related case" under § 1083(c)(3), the original action (to which the new case is being related) must have been "pending" as of "the date of the enactment of this Act [the NDAA] [Jan. 28, 2008]."  28 U.S.C. § 1083(c)(3)(B).[4]  *Roeder I* was dismissed in 2003, therefore, it was not pending in 2008 and cannot be considered a "related action" to *Roeder II*.

The government also relies on the statute's use of the past perfect tense to describe original actions to which new cases may be considered related under § 1083(c)(3).  The statute provides that new cases may be considered related to older

---

[4] Plaintiffs do not argue that *Roeder II* may be brought under § 1083(c)(3)(A); that would require that *Roeder II* have been commenced within 60 days of the date of judgment in the original action – *Roeder I*.  *Roeder II* was not filed until approximately five years after the D.C. Circuit's decision dismissing *Roeder I*.  Section 1083(c)(3)(A) is therefore inapposite.

actions, "[i]f [the original] action arising out of an act or
incident *has been* timely commenced." § 1083(c)(3) (emphasis
added). The government argues that the use of "has been"
supports the interpretation that "a new action cannot be deemed
'related' unless the original action (*Roeder I*) was pending"
when § 1083 was enacted. Gov't Mem. at 17. The government
claims the D.C. Circuit endorsed this reading of the statute in
*Simon v. Republic of Iraq*. In *Simon*, the D.C. Circuit
considered the meaning of § 1083(c)(3) but did not directly
address the question presented here. The *Simon* court
interpreted the NDAA to permit "a pending original action [to]
be[] refiled . . . by reason of section 1083(c)(2)(A)" while
separately allowing "a new action [to] be[] filed . . . by
reason of section 1083(c)(3) if a pending related action had
been timely commenced." 529 F.3d at 1193 (citations omitted).
The Court went on to state:

> [This] implies the Congress understood that the courts
> would retain jurisdiction over the original "related
> action" described in § 1083(c)(3). That explains why
> the 60-day period for invoking § 1083(c)(2) began with
> the enactment of the NDAA, whereas the 60-day period
> in § 1083(c)(3) may run from the date of the "entry of
> judgment" in the "related action," which could be well
> after the enactment of the NDAA.

*Id*. According to the government, this language suggests that
the *Simon* court read § 1083(c)(3) to signify that a new action

could only be filed if a related action had been timely commenced and was still pending.

Given these doubts regarding the proper interpretation of the statute, the government argues that it would be improper to interpret the statute as abrogating a binding international executive agreement, particularly in light of the absence of any legislative history relating to *Roeder I* or the Algiers Accords. Gov't Reply at 15-17. The government also notes that Congress is capable of drafting straightforward legislation explicitly abrogating the Algiers Accords, and cites as examples (1) the 2001 legislation, § 626(c), which clearly and unequivocally conferred jurisdiction over this action; and (2) bills such as those which have been introduced but not passed over the years and which, by their terms, abrogate the Algiers Accords. *See* CONGRESSIONAL RESEARCH SERV., SUITS AGAINST TERRORIST STATES BY VICTIMS OF TERRORISM (2008) at CRS 31-32. The fact that Congress has not acted clearly or decisively here means plaintiffs' claim must be dismissed. Gov't Mem. 17-18.

### ii. Plaintiffs' Claims

Plaintiffs advance a number of arguments why § 1605A(c) and § 1083(c)(3) should be construed to provide plaintiffs with a cause of action against Iran. As set forth below, although the Court finds plaintiffs' interpretations plausible, the government's interpretations are as well. And as set forth

above, the Court may not rely on plausibility to abrogate a
binding international agreement; unless the statute
unambiguously conflicts with the Algiers Accords, the Court must
interpret the statute to avoid the conflict.  Accordingly, the
Court cannot find that the 2008 legislation permits plaintiffs
to sue Iran.

Plaintiffs first argue that a comparison of § 1083(c)(2)
and § 1083(c)(3) compel the conclusion that *Roeder I* is a
"related" action under § 1083(c)(3).[5]  Plaintiffs note that the

---

[5] The parties agree that § 1083(c)(2) does not apply to this
case.  However, because the plaintiffs rely on it for the
purposes of comparison to § 1083(c)(3), it is set forth here in
relevant part:

(2) PRIOR ACTIONS.

    (A) In general. – With respect to any action that –

        (i)  was brought under section 1605(a)(7) of
            title 28, United States Code . . . before
            the date of the enactment of this Act [Jan.
            28, 2008],

        (ii) relied upon [] such provision as creating a
            cause of action,

        (iii) has been adversely affected on the grounds
            that . . . [§ 1605(a)(7)] fail[s] to create
            a cause of action against the state, and

        (iv) as of such date of enactment [Jan. 28,
            2008], is before the courts in any form,
            including on appeal or motion under rule
            60(b) of the Federal Rules of Civil
            Procedure,

text of § 1083(c)(2) explicitly governs actions which were "pending before the Courts in any form, including on appeal or motion under Rule 60(b)." Section 1083(c)(3), however, does not include the same, explicit language that a "related action" be "pending before the courts" on the date of the enactment of the NDAA. Plaintiffs claim that "the presence of a pending-action limitation in the text of § 1083(c)(2), and its absence in § 1083 (c)(3), makes clear that § 1083(c)(3) is not limited to actions relating to pending actions." Pls.' Opp'n 20 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")).

---

that action, and any judgment in the action shall, on motion made by plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code.

(B) Defenses waived. - The defenses of res judicata, collateral estoppel, and limitation period are waived--

(i) in any action with respect to which a motion is made under subparagraph (A) . . .

After careful consideration, the Court concludes that the general presumption articulated in *Russello* should not govern in this case.  As the Supreme Court has made clear, "[t]he *Russello* presumption – that the presence of a phrase in one provision and its absence in another reveals Congress' design – grows weaker with each difference in the formulation of the provisions under inspection." *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 435-436 (2002)); *see also Clay v. U.S.*, 537 U.S. 522, 532 (2003) (same); *Field v. Mans*, 516 U.S. 59, 67 (1995) (declining to "elevate[] [the *Russello* presumption] to the level of an interpretive trump card").

Reading § 1083(c)(2) and § 1083(c)(3) as integrated parts of a whole, it is clear that the two subsections serve distinct purposes.  Section (c)(2) does not authorize the filing of new cases.  Rather, it permits plaintiffs in older cases to reframe those same actions under § 1605A so long as they are still before the courts in some form, and expressly waives the defenses of statute of limitations, res judicata, and collateral estoppel.  Section 1083(c)(3), on the other hand, permits "related actions" to be filed, even if they are wholly new, as long as they relate to timely filed cases because they "arise out of the same act or event" as the first-filed case.  Stated another way, § 1083(c)(2) governs circumstances in which already-filed cases may change course, mid-stream, to proceed

under § 1605A, while § 1083(c)(3) governs circumstances in which entirely new actions may be filed as a result of the new legislation, even if such actions would otherwise be untimely.[6] In keeping with the distinctly different purposes of the two sections, § 1083(c)(3) borrows no probative language from § 1083(c)(2). To the contrary, the language, text and structure of the two sections have little to nothing in common. In short, the purpose and the language of § 1083(c)(2) are clearly distinguished from the purpose and the language of § 1083(c)(3). Therefore, the Court cannot conclude that the presence of the phrase "pending before the Courts in any form" in § (c)(2) but not § (c)(3) means that § (c)(3) unambiguously permits plaintiffs to file a new action five years after the action to which it was related ceased to exist before the courts.

Plaintiffs next argue that the government's reading of § 1083(c) would render § (c)(3)(B) superfluous of § (c)(3)(A).

_____

[6] In this regard, the Court notes that the underlying circumstances of the two *Roeder* cases may have more in common with § 1083(c)(2) than with § 1083(c)(3). The *Roeder II* complaint is substantially identical to the *Roeder I* complaint; the only substantive difference is the statutory section under which plaintiffs allege a cause of action. Compare *Roeder I*, Doc. No. 3, First Am. Compl. (relying on former § 1605(a)(7) for cause of action), with *Roeder II*, Doc. No. 1, Complaint (relying on § 1605A for cause of action). Accordingly, it could be argued that the *Roeder II* plaintiffs are effectively refiling the same action, and are citing § 1083(c)(3) in an attempt to avoid the otherwise-fatal restrictions of § 1083(c)(2).

Section 1083(c)(3) provides that a related action is timely filed:

> if the action is commenced not later than the latter of 60 days after
>
> (A) the date of entry of judgment in the original action; or
>
> (B) the date of enactment of this Act.

Plaintiffs claim that if the Court accepts the government's argument that all original cases had to be "pending" when the NDAA was enacted, "then there would be no need to include clause (B). Rather, the timeliness of filing test would always run from entry of final judgment in the pending action, which would necessarily be more than sixty days later than the date of the NDAA's enactment." Pls.' Opp'n at 23. Accordingly, plaintiffs argue that the government's reading of the statute cannot be reasonable because it would require the Court to construe one of its clauses as superfluous or void. *Id.* (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

Plaintiffs take too cramped a view of the term "entry of judgment." § 1083(c)(3)(A). The Federal Rules of Civil Procedure provide multiple avenues by which a court may enter a judgment. *See, e.g.*, Fed. R. Civ. P. 50, 52, 54(a), 55(b), 56, 57. The Federal Rules of Appellate Procedure and Supreme Court Rules also provide for entry of judgment under additional

circumstances. *See, e.g.*, Fed. R. App. P. 36.; Sup. Ct. R. 41 – 44. The Court can easily envision several scenarios where entry of judgment in the original, related case could have been entered far in advance of the enactment of the NDAA – for instance, the district court could have entered judgment and the case could still be pending on appeal, pursuant to a motion to alter or amend under Fed. R. Civ. P. 59(e), or on a motion for relief from judgment under Fed. R. Civ. P. 60(b). In any of these situations, the latter date for purposes of timely filing the new, related action under § 1083(c)(3) would be "sixty days after the enactment of [the NDAA]", § 1083(c)(3)(B), thus giving meaning and effect to both subsections.

Finally, plaintiffs argue that the use of the present perfect tense in § 1083(c)(3) – "[i]f an action arising out of an act or incident has been timely commenced" – does not indicate that a new action cannot be deemed "related" unless the original action (*Roeder I*) was pending at the time § 1083 was enacted. Pls.' Opp'n 28. Plaintiffs cite *Barrett v. United States*, 423 U.S. 212 (1976) for the proposition that "has been" denotes an action that has been *completed*. In *Barrett*, the Court found that the term "has been shipped" encompassed items that had been shipped and completed their journey in interstate commerce as well as those items that were still in the process of being shipped. Thus, plaintiffs argue, the phrase "has been

timely commenced" must include not only actions that were still pending when the NDAA was enacted, but also actions such as *Roeder I*, which were completed at that time. Pls.' Opp'n at 28-29. The United States counters that *Barrett* does not change the analysis. Gov't Reply at 12, n.9. The government argues that even if the present perfect tense connotes an act that has been completed, the phrase in § 1083(c)(3) "has been commenced" would simply mean that commencement, or filing of the action, has been completed. *Id*. It does not compel the conclusion that the entire *case* can be completed and a related action may still be filed under § 1083(c)(3). *Id*.

The Court finds that the phrase "has been commenced" does not resolve the textual ambiguity in the statute. The phrase may be reasonably read to limit § 1083(c)(3)'s reach to cases related to those which were timely filed and are still pending, as the government argues, or to encompass cases related to any and all cases that were timely filed in the first instance, regardless of whether they were still pending when the NDAA became law, as plaintiffs argue. However, the Court need not resolve these questions here: plaintiffs cannot prevail unless they can show that theirs is the *only* reasonable reading of the statute. For the reasons set forth above, they cannot.

**D.  The Record is Devoid of Any Clear Evidence of Congressional Intent to Abrogate the Algiers Accords.**

Because the NDAA is ambiguous, "this Court must not interpret [it] to conflict with the Algiers Accords absent a clear intent to abrogate that agreement by Congress." *Roeder I*, 195 F. Supp. 2d at 175.  As set forth above,

> [L]egislative silence is not sufficient to [find clear intent to] abrogate a treaty or a bilateral executive international agreement.  When a later [ambiguous] statute conflicts with an earlier agreement, and Congress has neither mentioned the agreement in the text of the statute nor in the legislative history of the statute, the Supreme Court has conclusively held that it can not find the requisite Congressional intent to abrogate.

*Id.* (internal quotations and citations omitted.)  It is undisputed that the Algiers Accords is neither mentioned in the statute, nor discussed or even alluded to in the legislative history.  Nevertheless, plaintiffs contend that even if the statute does not unambiguously create a cause of action for them to sue Iran, the Court should find that the legislative history provides clear congressional intent to abrogate the Algiers Accords.  *See* Pls.' Opp'n 17-18 ("Section 1083 was not overlooked by Congress or the President.")  In support of this statement, they note that the NDAA's language regarding *Roeder I* survived a presidential veto and subsequent negotiations over § 1083.  They claim that "the intense attention the political branches directed to this very section," demonstrates that the

other two branches of government clearly intended § 1083 must abrogate the Algiers Accords.  Pls.' Opp'n 18.

This argument is easily resolved.  A review of the legislative history reveals that none of the attention focused on § 1083 had anything to do with the provisions at issue in this litigation.   The D.C. Circuit accurately summarized the history of the NDAA's passage as follows:  "President Bush sought to 'pocket veto' the bill because he believed § 1083 would threaten the reconstruction of Iraq. . . . Congress subsequently passed a revised version of the NDAA, which included a new provision (§ 1083(d)) that authorized the President, upon making certain findings, to 'waive any provision of [§ 1083 of the NDAA] with respect to Iraq.  The President signed that bill into law.'" *Simon*, 529 F.3d at 1190 (citations omitted).  The legislative history adds nothing to support plaintiffs' argument.  To the contrary, as the government correctly notes, "the fact that the political branches gave Section 1083 this allegedly 'intense attention', without once even mentioning the Algiers Accords or the 1979 Iranian hostage taking, is compelling evidence that Congress did not intend to repeal the Accords or to offer the *Roeder I* plaintiffs a cause of action, and that the President did not interpret the NDAA to include an abrogation of the Accords."  Gov't Reply at 15

(quoting Pls.' Opp'n at 18) (emphasis in original).  The Court concurs.

As this Court found in *Roeder I*, "[a]n explicit expression of intent to abrogate a binding international agreement requires, at a minimum, an acknowledgment of the existence of that agreement[.]"  *Roeder I*, 195 F. Supp. 2d at 182.  In *Roeder I*, this Court was faced with legislative history which directly referenced that case *and* alluded to the Algiers Accords.  Nevertheless, the D.C. Circuit held that because the relevant legislative history was contained in a "joint explanatory statement," a form of committee report which is never subject to a Congressional vote, it was insufficient to abrogate the Algiers Accords.  *See Roeder I*, 333 F.3d at 236-238.  In *Roeder II*, plaintiffs' arguments for clear Congressional intent are even weaker than *Roeder I*; the legislative history of the NDAA is utterly silent with respect to either the Algiers Accords or this case.  Accordingly, the Court finds no clear Congressional intent to abrogate the executive agreement.

### E.  Chief Judge Royce C. Lamberth's Opinion Does Not Alter This Court's Analysis.

Finally, the Court turns to plaintiffs' argument that Chief Judge Lamberth's opinion in *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31 (D.D.C. 2009), brought to the Court's attention by plaintiffs as supplemental

authority, should guide this Court's analysis and conclusions. The Court gave the parties the opportunity to fully brief the import of the opinion and, after careful consideration of the opinion and the parties' arguments, concludes that the supplemental authority does not alter this Court's analysis.

Plaintiffs principally rely on *In re Iran Terrorism Litigation* for its conclusion that § 1083(c)(3) allows terrorism victims to file "related cases" within 60 days after the NDAA's enactment, even if the original case to which the new case relates was no longer pending. Specifically, plaintiffs point to that court's determination that "the heading of § 1083(c) – 'Application to Pending Cases' - is something of a misnomer because, in reality, § 1083(c) may encompass cases that are not pending at all - meaning prior actions that have since reached final judgment and are no longer before the courts in any form." *Id.* at 63. Plaintiffs argue that Chief Judge Lamberth's interpretation of § 1083(c)(3), which comports with plaintiffs' interpretation, "makes clear that the current opposition is without any statutory basis." Pls.' Supp. Auth. Mem. at 10.

The Court is unpersuaded by the plaintiffs' selective reading of *In re Iran Terrorism Litigation*. While the cases addressed in that opinion all name the Islamic Republic of Iran as a state sponsor of terrorism, none of the cases arises out of the 1979 hostage taking and consequently none of them is

governed by the Algiers Accords. Notwithstanding any
conclusions Chief Judge Lamberth may have reached regarding the
meaning of § 1083(c)(3), he - correctly - went to great pains to
distinguish the cases before him from the case before this
Court. As set forth above, Chief Judge Lamberth found that new
"related actions" could be filed against Iran arising out of the
same acts or incidents as had been originally litigated before
him, even if the original actions were no longer pending when
the NDAA was enacted. However, he explained that the standard
the *Roeder* plaintiffs must meet in order to sue Iran is
different.

> Congress [must have] clearly expressed its intent to
> abrogate the Algiers Accords, as is required before
> Courts will hold that an international agreement is
> abrogated by a subsequent act of Congress. . . . Judge
> Sullivan [] went to some length in his [*Roeder I*]
> opinion to explain that, while our Court cannot ignore
> or refuse to give effect to the Algiers Accords, both
> Congress and the President have the authority to
> abrogate them, if they so desire. The opinion could
> not have been any clearer on that point. *To date,*
> *however, neither branch has taken such action; the*
> *political consequences are likely too great, but that*
> *is precisely why it is a decision best left to the*
> *political branches, and not the Courts.*

659 F. Supp. 2d at 88-89 (internal quotations and citations
omitted) (emphasis added). In short, the *In re Iran Terrorism*
*Litigation* court recognized that while the NDAA granted
significant new rights and privileges to terrorism victims in

general, the 1979 hostage victims do not fall under the category of terrorism victims in general.  The opinion also recognized that absent clear abrogation of the Algiers Accords, which the NDAA did not accomplish, the plaintiffs are in the same position now as they were prior to the enactment of the NDAA.  *Id.* at 89-90.  Plaintiffs' supplemental authority does not change this Court's analysis; it reinforces it.

As discussed in Section III.C. *supra*, this Court does not necessarily disagree with Chief Judge Lamberth that § 1083(c)(3) could support the reading urged by plaintiffs.  However, as set forth throughout, the language of the statute does not unambiguously require such a conclusion with respect to the 1979 hostage victims, and thus does not abrogate the Algiers Accords.

## IV.  CONCLUSION

In this case, as in *Roeder I*, much time and effort have been expended parsing esoteric phrases of statutory text and legislative history in an effort to discern the intent of Congress.  As in *Roeder I*, this Court is acutely sensitive to the indescribable horror of plaintiffs' suffering.  *See Roeder I*, 195 F. Supp. 2d at 145 ("Were this Court empowered to judge by its sense of justice, the heart-breaking accounts of the emotional and physical toll of those 444 days on plaintiffs would be more than sufficient justification for granting all the relief that they request.")  The principles that guided the

43

Court's decision in *Roeder I*, however, are fundamental to our system of government and the fair administration of justice. They are equally binding on this Court now, and they bear repeating.

> Lest this Court's decision be viewed as denying plaintiffs a remedy for the horrible wrongs they have suffered simply because Congress failed to use the proper choice of words, it is important to reiterate the values that are served by an abrogation doctrine that requires Congress to make its intent clear. The spheres of power of our co-equal branches of government can at times overlap. When such overlap occurs, and the wills of two branches are in conflict, the Constitution sets forth the rules for deciding which branch gets to trump the will of the other. In this case, by virtue of his power to direct the foreign affairs of this country, the President clearly has the authority to enter into international agreements. Congress, however, clearly has the corresponding right to abrogate the agreement reached by the President if it so wishes. Because of the respect owed to each co-equal branch of government, the courts must require that Congress make its intent clear, either by legislating unambiguously or accompanying ambiguous statutes with clear expressions of intent. Any other rule would allow the courts, by inference and interpretation, to impermissibly assume the legislative role.

*Roeder I*, 195 F. Supp. 2d at 183 (internal citation omitted).

As discussed throughout this opinion, Congress has failed to enact plain, straightforward language creating a cause of action for plaintiffs; nor has Congress clearly expressed its intent to abrogate the Algiers Accords. Regrettably, this Court must conclude as a matter of law that the plaintiffs cannot pursue a

lawsuit for damages for the human suffering and atrocities inflicted upon them by the Islamic Republic of Iran.

For the foregoing reasons, it is hereby **ORDERED** that the United States' motion to dismiss is **GRANTED** as plaintiffs have failed to state a claim upon which this Court can grant relief. Plaintiffs' motion for default judgment as to liability is **DENIED** as moot.  This case is therefore **DISMISSED.**  An appropriate Order accompanies this memorandum opinion.

**SIGNED:**     **Emmet G. Sullivan**
              **United States District Court Judge**
              **September 30, 2010**